# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SAFELITE GROUP, INC.,**

      **Plaintiff,**

                                    **Case No. 2:21-cv-4558**
                                      **Judge Sarah D. Morrison**
    **v.**                              **Magistrate Judge Elizabeth P. Deavers**

**NATHANIEL LOCKRIDGE, *et al.*,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendant Caliber Collision Centers (Caliber Holdings Corporation) d/b/a Caliber Auto Glass' ("Caliber") Motion to Compel Discovery from Plaintiff (ECF No. 257) and Plaintiff Safelite Group Inc.'s ("Safelite") Motion to Compel Discovery (ECF No. 258). Both motions have been fully briefed. (ECF Nos. 259, 262, 260, 261.) For the following reasons, both motions (ECF Nos. 257, 258) are **DENIED, in part, and GRANTED, in part,** as set forth below.

### I.      Legal Standard

"District courts have broad discretion over docket control and the discovery process." *Pittman v. Experian Info. Sol., Inc*., 901 F.3d 619, 642 (6th Cir. 2018) (citation omitted). "'It is well established that the scope of discovery is within the sound discretion of the trial court.'" *Id*. (quoting *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993)). The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). While a plaintiff should "not be denied access to information necessary to

establish her claim," a plaintiff may not be "permitted to go fishing and a trial court retains

discretion to determine that a discovery request is too broad and oppressive." *In re Ohio*

*Execution Protocol Litigation*, 845 F.3d 231, 236 (6th Cir. 2016) (citation omitted); *see also*

*Gallagher v. Anthony*, No. 16-cv-00284, 2016 WL 2997599, at *1 (N.D. Ohio May 24, 2016)

("[D]istrict courts have discretion to limit the scope of discovery where the information sought is

overly broad or would prove unduly burdensome to produce.").

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding

any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P.

26(b)(1); *see also Siriano v. Goodman Mfg. Co., L.P.*, No. 2:14-CV-1131, 2015 WL 8259548, at

*5 (S.D. Ohio Dec. 9, 2015). "*Relevance* is construed very broadly for discovery purposes." *Doe*

*v. Ohio State Univ.*, No. 2:16-CV-171, 2018 WL 1373868, at *2 (S.D. Ohio Mar. 19, 2018)

(emphasis in original) (citation omitted)). Despite being construed broadly, the concept of

relevance is not unlimited. *Averett v. Honda of Am. Mfg., Inc.*, No. 2:07-cv-1167, 2009 WL

799638, at *2 (S.D. Ohio March 24, 2009). Indeed, "[t]o satisfy the discoverability standard, the

information sought must have more than minimal relevance to the claims or defenses." *Doe*,

2018 WL 1373868 at *2 (citations omitted). Furthermore, when information is "negligibly

relevant [or] minimally important in resolving the issues" this will not satisfy the standard. *Id.*

(citation omitted).

"[T]he Federal Rules of Civil Procedure instruct district courts to limit discovery where its

'burden or expense . . . outweighs its likely benefit, taking into account the needs of the case, the

amount in controversy, the parties' resources, the importance of the issues at stake in the

litigation, and the importance of the proposed discovery in resolving the issues.'" *Surles ex rel.*

*Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (quoting former Fed. R.

2

Civ. P. 26(b)(2)(C)(iii)). This Court has previously held that "[t]hese factors are retained in revised Fed. R. Civ. P. 26(b)(1), reflecting 'their original place in defining the scope of discovery'" because "'[r]estoring proportionality' is the touchstone of revised Rule 26(b)(1)'s scope of discovery provisions." *Siriano*, 2015 WL 8259548, at *5 (citing Fed. R. Civ. P. 26(b)(1)). In analyzing the extent of the burden on the producing party, the Court of Appeals for the Sixth Circuit "has held that limiting the scope of discovery is appropriate when compliance 'would prove *unduly* burdensome,' not merely expensive or time-consuming." *Id.* (citing *Surles*, 474 F.3d at 305) (emphasis in original).

## II.    Background

The current motions represent another iteration in a series of discovery disputes between these parties requiring Court intervention. For its part, Caliber's Motion to Compel relates to Safelite's Initial Disclosures, and Safelite's allegedly deficient responses to Interrogatories 13 and 18 and Request for Production Nos. 42 and 43, discovery requests Caliber contends are directed to Safelite's alleged damages (the "Damages Discovery"). This is Caliber's second motion to compel directed to the Disclosures and Interrogatories. (*See* ECF No. 212.) Caliber also seeks to compel complete responses to Requests for Production Nos. 46-48 and 55, requests directed to compensation, evaluation and performance for technicians in Texas and Arizona. Finally, Caliber seeks to compel Safelite's supplemental response to Request for Production No. 57 relating to the job satisfaction of technicians in Texas and Arizona, also a subject of Caliber's previous motion to compel (collectively, the "Technician Discovery"). (*Id.*)

Safelite's Motion to Compel relates to two specific sets of discovery requests. The first set, comprised of Request for Production Nos. 14-24, relates to communications from and between specific Caliber personnel involved in the expansion of Caliber's autoglass business

along with the individual Defendants (the "Communication RFPs").  The second set, comprised

of Request for Production Nos. 53, 57, 58, 59, 61, 62, 63, 64, 66, 67, and 68, is addressed to

information from Caliber concerning potential damages in this case (the "Damages RFPs")[1].

The Court considers each motion in turn.

### III.  Caliber's Motion to Compel

**A.   The Damages Discovery**

**1. Initial Disclosures**

As Caliber explains, it seeks the documents and data Safelite will use to support the

following categories of damages identified in Safelite's Initial Disclosures:

> • "Economic effects of Defendants' actions on Safelite . . . Safelite's lost profits
> will capture its **lost business of existing and potential new customers**, as well as
> the **cost of training replacements** for poached employees – number of new
> employees needed as a result of Caliber's conspiracy x **cost of recruitment,
> hiring, and training** of an employee; and

> • Sanctions/Remedies for Spoliations – Safelite intends to pursue . . . **monetary
> damages**, resulting from the spoliations in this case; and

> • **Attorney's fees, costs, and expenses**."

(ECF No. 262 at 6.)

In moving to compel, Caliber continues to assert that Safelite has "shirked" its discovery

obligations in "blatant" violation of Rule 26 because it has failed to provide all documents

supporting these categories of damages.  ECF Nos. 257 at 10; ECF No. 262 at 7.)

According to Safelite, it has served supplemental Initial Disclosures explaining its

general methodology for each category of damages it is seeking.  With respect to the first

category, Safelite represents that its expert will provide an exact computation of damages before

the close of discovery based on Safelite's own documents and documents requested from

---

[1] In its Motion, Safelite agrees to withdraw RFPs 56 and 65.  *See* ECF No. 258, n. 3.

4

Caliber.  Further, Safelite asserts that it has provided Caliber all financial statements provided to Safelite's expert to date, and that evidence relating to other variables, such as the cost of training an employee, will come from deposition testimony.  Turning to the second category, Safelite explains that there are no documents to support a monetary sanction to be produced at this time.  Finally, as for the third category, Safelite essentially contends that attorney's fees, costs, and expenses would be the subject of a motion after judgment.

Taking the final category first, the Court agrees that these issues would be the subject of a post-judgment motion. *Fraker v. Marysville Exempted Vill. Sch.,* No. 2:08-CV-58, 2009 WL 414364, at *2 (S.D. Ohio Feb. 13, 2009 (contrasting the fees the plaintiff was incurring in the case which would be the subject of a motion for an award of fees filed after judgment should plaintiff prevail and, therefore not an element of his damages with attorneys' fees that make up part of his damages claim).  Accordingly, the Court will not order Safelite to supplement its Initial Disclosures with this information.  With respect the second category, as discussed more thoroughly below, Safelite has no obligation to produce documents that do not exist. *Alomari v. Ohio Dep't of Pub. Safety*, No. 2:11-CV-00613, 2013 WL 5874762, at *4 (S.D. Ohio Oct. 30, 2013).  Thus, the Court also declines to order Safelite to supplement its Initial Disclosures with this information.

This brings the Court to the first category.  Caliber's position here with respect to Safelite's Initial Disclosures reveal a constant theme throughout this, and its previous, Motions to Compel, as well as in conferences with the Court.  Caliber's arguments assume that Safelite's damages information is "neatly contained in documents kept in the usual course of business." (ECF No. 259 at 8.)  Caliber's continued insistence with respect the issue of damages, however, fails to recognize that, "[d]amages in trade secrets cases are difficult to calculate." *Avery*

*Dennison Corp. v. Four Pillars Enter. Co.,* 45 F. App'x 479, 485 (6th Cir. 2002). As a result, "[e]ach trade secrets 'case requires a flexible and imaginative approach to the problem of damages.'" *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,* 53 F.4th 368, 387 (6th Cir. 2022) (quoting Melvin F. Jager, 1 Trade Secrets Law § 7:20 (Oct. 2021).

Confronted with this reality, trade secret cases frequently require expert damages modeling as Safelite describes it intends to employ here. Given its monitoring of this dispute over several months and, in recognition of the difficulties in calculating damages in a case of this nature, the Court is satisfied that Safelite has complied with its Initial Disclosure obligations to date. Of course, if Safelite's representations are revealed to be incorrect at a later time, Caliber will have options available for addressing any demonstrable prejudice it has suffered. Accordingly, the Court will not require Safelite to further supplement its Initial Disclosures at this time.

### 2. Interrogatories 13 and 18

Caliber seeks complete supplemental responses to these Interrogatories as follows:

- **Interrogatory 13: Regarding the allegations set forth in Paragraph 176(2) of the First Amended Complaint that "Caliber,** without justification, intentionally and improperly interfered with Safelite's existing contracts with Nowak, Billingsley, Lockridge by, among other things . . . (2) **knowingly receiving confidential, proprietary, and trade secret information from Billingsley, and Lockridge and using that information** to compete directly with Safelite and **to divert sales from Safelite, causing Safelite to suffer lost profits,"** please identify (i) the specific sales that Safelite claims were diverted; and (ii) the total amount of lost profits resulting from those lost sales.

- **Interrogatory 18:** With respect to Safelite's **claimed damages for each count contained in the Second Amended Complaint**, identify and describe in detail every monetary loss and/or non-monetary loss or damage Safelite contends it has sustained as a result of Caliber's alleged conduct described in the Second Amended Complaint, including: the nature of the loss or damage; **the amount of the loss or damage; the approximate date(s) or time(s) when Safelite sustained the loss or damage; the**

> **identity of any person(s) who has knowledge of the alleged loss or damage;** each separate item or component constituting a part of the total damages stated in the answer to this Interrogatory; **the method of calculating the dollar amount claimed for each separate item or component of damages; all documents that evidence, support, reflect, corroborate and relate to Safelite's actual damages claim, and all persons upon whom it has relied** in determining the amount of Safelite's alleged actual damages and loss; the **total amount** of damages being claimed by Safelite; and the **identity and custodian** of each document that supports or relates to the loss or damage.

(ECF No. 262 at 3.)

Safelite asserts that it has produced profit and loss statements on which its expert is relying to calculate a damages model for lost profits but cannot provide more information because it does not have "specific" individual sales to identify.  Thus, in Safelite's view, it cannot respond to these Interrogatories any differently than it already has.  For the same reasons discussed above with respect to Safelite's Initial Disclosures, the Court will not direct Safelite to supplement its Response to these Interrogatories at this time.  Again, Caliber will have options available for addressing any demonstrable prejudice it has suffered as appropriate at a later date.

### 3. RFPs 42 and 43

- **RFP 42.** All documents and communications evidencing, supporting, or relating to the amount and/or calculation of each and every element of the alleged damages sought by Safelite in the Second Amended Complaint.

-  **RFP 43.** All documents and communications evidencing, supporting, or relating to the amount and/or calculation of damages or lost profits Safelite allegedly sustained as a result of Caliber's actions as alleged in the Second Amended Complaint.

Safelite again explains that damages cannot be cleanly stated in this case and Caliber's insistent view to the contrary is "oversimplified."  (ECF No. 259 at 8.)  Rather, according to Safelite, it is attempting to model its costs and has provided, and will continue to provide to Caliber, any documents it uses to do so.

Caliber acknowledges Safelite's representation that it is "not withholding any documents related to its damages" and that "Safelite cannot create documents that do not exist." (ECF No. 262 at 8.) Nevertheless, Caliber speculates that Safelite "***may be***" withholding unfavorable information from its expert or delaying the provision of information Caliber is entitled to receive now. (*Id.*)

As noted above, Safelite has no obligation to produce documents that do not exist. *Alomari,* 2013 WL 5874762, at *4. Further, "[t]he representation of a responding party's attorney that no other documents exist 'is sufficient to defeat a [discovery motion] absent credible evidence that the representation is inaccurate.'" *State Farm Mut., Auto. Ins. Co. v. Max Rehab Physical Therapy, LLC*, No. CV 18-13257, 2021 WL 2843832, at *3 (E.D. Mich. June 28, 2021), *report and recommendation adopted*, No. CV 18-13257, 2021 WL 3930133 (E.D. Mich. Sept. 2, 2021) (quoting *Phoenix Process Equip. Co. v. Capital Equip. & Trading Corp.*, 2021 WL 1062553, at *4 (W.D. Ky. Mar. 19, 2021)). Of course, trial counsel has an affirmative obligation to insure that what a client is telling them is accurate and the Court presumes that they have discharged their duties in this case accordingly. *Snyder v. Fleetwood RV, Inc.,* No. 2:13-CV-1019, 2016 WL 339972, at *6 (S.D. Ohio Jan. 28, 2016) (citing *Bratka v. Anheuser-Busch Co., Inc*., 164 F.R.D. 448 (S.D. Ohio 1995)(Graham, J.)); *see also Brown v. Tellermate Holdings Ltd.,* No. 2:11-CV-1122, 2014 WL 2987051, at *17 (S.D. Ohio July 1, 2014), *adopted as modified*, No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) (quoting *Bernal v. All American Investment Realty, Inc.,* 479 F.Supp.2d 1291, 1333 (S.D.Fla.2007))("sanctions can be imposed if an attorney fails in his or her 'duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents.'").

On the other hand, speculation that additional documents must exist is insufficient unless evidence is offered that a party is improperly withholding documents. *Alomari,* at *4. Credible evidence includes presentation of responsive documents that the moving party obtained from another source or testimony showing knowledge of the existence of responsive documents. *State Farm,* at *3. As noted, Caliber has provided no such evidentiary support here. Accordingly, Caliber's Motion to Compel is **DENIED** as to RFPs 42 and 43.

### B. The Technician Discovery

#### 1. RFPs 46-48

These RFPs, addressed together by the parties, request the following information:

- **RFP 46:** All documents and communications evidencing, supporting, or relating to the method by which Safelite calculated the compensation of technicians working in Texas and/or Arizona from January 1, 2020 through the present.

- **RFP 47:** All documents and communications evidencing, supporting, or relating to changes to the method by which Safelite calculated the compensation of technicians working in Texas and/or Arizona from January 1, 2020 through the present.

- **RFP 48:** All policies and/or procedures maintained by Safelite regarding compensation and benefits provided by Safelite to technicians working in Texas and/or Arizona from January 1, 2020 through the present.

Safelite does not challenge the relevance of the requested information. Indeed, Safelite states that it already has provided, through both its initial and supplemental productions the pay plan for technicians currently in effect, the incentive plan for technicians that was in effect until roughly the time of the individual Defendants' departure from Safelite, a PowerPoint that further explains the pay plan, and pay records of the individual Defendants. Thus, according to Safelite, it has provided Caliber with information that covers how Safelite pays its technicians and how that payment plan has evolved and has done so in a way that covers both the relevant time frame

and every geographic market. Beyond this, Safelite claims undue burden arising from any intention Caliber may have to seek compensation information for all 13,000 Safelite employees.

For its part, Caliber disputes that Safelite's production of "***three*** documents" is sufficiently responsive to these RFPs. (ECF No. 262 at 9.) Specifically, Caliber claims that Safelite failed to produce any documents related to technician pay for 2020 or any policies regarding technician pay. Caliber also objects to Safelite's position that the relevant time period ended in 2021. In Caliber's view, it is entitled to assess if Safelite technician departure after 2021 is a result of something other than the alleged solicitation, for example, pay changes.

The Court finds that Caliber has the better argument here. In reaching this conclusion, the Court notes that the plain language of these requests is confined to technicians and not all 13,000 Safelite employees as Safelite suggests. Thus, there is no merit to Safelite's claim of undue burden. Accordingly, Caliber's Motion to Compel is **GRANTED** as to RFPs 46-48. To the extent it has not fully responded to these RFPs, Safelite is **DIRECTED** to do so **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

> **2. RFP 55:** All documents and communications evidencing, supporting, or relating to practices, policies, or procedures maintained by Safelite for evaluating the performance of its technicians working in Texas and/or Arizona from January 1, 2020 through the present.

There appears to be no dispute that Safelite has produced 20 performance evaluations for 2020. Thus, through its motion, Caliber explains that it is seeking the remaining performance evaluations for technicians working in Texas and Arizona. According to Caliber, these evaluations are necessary to prepare its defenses to Safelite's claim that Caliber unlawfully solicited Safelite's "highest performing technicians."

Safelite appears to concede the relevance of this information and represents that it is working with its IT Department to retrieve additional records regarding technician performance.

10

"[T]o the extent those efforts succeed," Safelite confirms that it "will produce additional records." (ECF No. 259 at 11.) Beyond this, Safelite suggests that, to the extent Caliber may be seeking all documents related to Safelite's "practices" for evaluating technicians, the RFP is overbroad.

Caliber has confirmed that it seeks the remaining performance evaluations for technicians working in Texas and Arizona. Thus, there is no merit to Safelite's suggestion of overbreadth. Accordingly, Caliber's Motion to Compel is **GRANTED** and Safelite is **DIRECTED** to respond to RFP 55 in full **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER**.

> 3. **RFP 57:** All documents and communications evidencing, supporting, or relating to Safelite's Texas and/Arizona based technicians' job satisfaction, including but not limited to internal employee surveys, reports prepared by consultants, and notes or summaries of interviews.

Turning to Request for Production No. 57, Caliber asserts that Safelite has produced employee satisfaction surveys only for the year 2020 and only for technicians supervised by the individual Defendants. Thus, Caliber seeks an order compelling Safelite to produce employee satisfaction surveys for all technicians based in Texas and Arizona for the years 2020, 2021, and 2022.

Safelite raises a number of objections to this particular request. Specifically, Safelite asserts undue burden, the availability of this information via the use of a third-party subpoena, the minimal probative value stemming from the surveys' anonymity, questionable relevance, and lack of proportionality.

 Caliber dismisses Safelite's objections. First, with respect to relevance, Caliber explains that Safelite never has claimed that Caliber only solicited technicians who worked for the individual Defendants. Rather, Caliber asserts, Safelite has alleged "a ***nationwide*** scheme to improperly solicit and hire 'managerial-level current or former Safelite employees' – not just

technicians—to come work at Caliber." (ECF No. 262 at 10.) Thus, Caliber contends that the requested information is "essential to[its] defense that Safelite's technicians voluntarily left Safelite because of their dissatisfaction with their jobs, rather than unlawful solicitation." (*Id.* at 10-11.) Caliber also argues that Safelite has access to the surveys and the resources to undertake this additional discovery.

For the reasons cited by Caliber, the information Caliber seeks through this RFP is relevant. Safelite does not seriously challenge relevance but focuses on the issue of the burden required to produce the requested information. Given the Court's finding of relevance, the burden shifts to Safelite to demonstrate that production of this information would be unduly burdensome. *See Delta T, LLC v. Williams*, 337 F.R.D. 395, 398 (S.D. Ohio 2021). Mere statements that the discovery requests are burdensome, however, are not adequate to meet this burden. *Veritiv Operating Co. v. Phoenix Paper Wickliffe, LLC*, No. 521CV00170BJBHBB, 2023 WL 2975868, at *7 (W.D. Ky. Apr. 17, 2023) (citation omitted). Rather, as the nonmoving party, Safelite must demonstrate specifically how each discovery request is burdensome either by submitting affidavits or offering other evidence "revealing the nature of the burden." *Id. (citing Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 569 F. Supp. 3d 626, 634 (E.D. Mich. 2021); *Cratty v. City of Wyandotte*, 296 F. Supp. 3d 854, 859 (E.D. Mich. 2017)).

On this issue, Safelite has submitted a Declaration from Cassie Collins, its Talent Programs Manager. (ECF No. 259-1.) According to the Declaration, Safelite tracks technician engagement by using a third party vendor to conduct annual surveys. (*Id*. at ¶ 2.) Those surveys are maintained in the custody of the vendor, although Ms. Collins has access to the reporting provided by the vendor. (*Id*.) The surveys are anonymous and Ms. Collins is not able to access a non-anonymous version of the surveys. (*Id*. at ¶ 5.) Prior to 2022, Safelite did not have separate reports focused only on technicians, so reports for each supervisor reflected all employees who reported to that supervisor,

regardless of whether they worked as technicians. (*Id.* at ⁋ 6.) Safelite is able to pull reports reflecting employee engagement by supervisor but cannot pull technician-only engagement reports prior to 2022. (*Id.* at ⁋ 7.) Each individual supervisor's report takes 60-90 minutes to pull because the raw report that the system generates does not present the data in a usable way. (*Id.* at ⁋ 8.) To pull reports that collectively covered all technicians in Texas and Arizona would take several hours given the number of supervisors in those markets. (*Id.*) Safelite explains that there are approximately 51 Safelite locations in Texas and 32 in Arizona such that producing reports for each supervisor in Texas and Arizona regardless of market over three years would be an extensive undertaking.

Despite Safelite's submission of Ms. Collins's Declaration, the current record is not sufficient to allow the Court to determine whether Caliber's RFP 57 is unduly burdensome to Safelite. For example, although Safelite cites the existence of 84 locations between the Texas and Arizona markets, it provides no evidence of the number of individual supervisors involved – an important consideration to the extent the reports are pulled by individual supervisor. Further, Safelite has provided no information as to the cost of responding to this RFP. Additionally, although Safelite asserts that this evidence is readily available to Caliber via subpoena, Safelite does not seriously argue that the information is not within Safelite's custody or control even though it is stored with Safelite's vendor. Indeed, Ms. Collins confirms her ability to access the surveys. (ECF No. 259-1 at ⁋ 2.)

Under this circumstance, the Court orders as follows. Based on Safelite's representation that it has 84 locations across Arizona and Texas, the parties are **DIRECTED** to meet and confer on the selection of ten representative locations – five from each state. Upon the selection of the ten representative locations, Safelite is **DIRECTED** to pull each individual supervisor's report(s) for those locations as requested by this RFP. **WITHIN FIVE DAYS THEREAFTER,** Safelite

is **DIRECTED** to provide the information to Caliber's counsel along with the time and cost associated with pulling the reports. If, upon the exchange of this information, Caliber continues to seek corresponding information for the remaining locations, the parties are **DIRECTED** to again meet and confer regarding the procedure for obtaining this additional information. To the extent the parties are unable to come to an agreement, they may seek the Court's intervention.

### IV.     Safelite's Motion to Compel

#### A.  Communication RFPs

Through its Motion to Compel, Safelite seeks text messages from a targeted group of Caliber personnel, including the individual Defendants, Chris Abal, Mark Turner, Michael Fox, Nicole Jensen, Tabitha Salas, and Lisa Kokinda. In Safelite's view, Caliber unilaterally limited the timeframe of the responsive texts; for Fox, Jensen, Salas, and Kokinda refused to produce a single text message; and for Abal produced only text messages with the individual Defendants. With respect to Turner, Safelite explains that it is concerned only with Caliber's redaction of messages that postdate his employment with Caliber and the potential withholding of relevant messages with people other than the individual Defendants.[2] Safelite contends that the information it seeks is relevant because it could include discussions of the individual Defendants' hiring, the use of their Safelite contacts, Caliber's attempts to hide the individual Defendants' activities, and efforts to compete with Safelite in restricted areas. Safelite asserts that Caliber has identified many of these individuals as persons with relevant information and Caliber already has produced email communications involving many of them.

---

[2] This appears to relate to Turner's personal phone. As Safelite explains, counsel for Caliber informed counsel for Safelite that Turner ceased conducting business on his Caliber-issued phone on or around September 8, 2021. (ECF No. 258 at 4.) Accordingly, Safelite subpoenaed Turner to produce relevant text messages and counsel for Caliber accepted service. (*Id.*) After some back and forth, Turner ultimately produced responsive communications. (*Id.*)

Much of Caliber's objection to the Communication RFPs is that the parties already have finalized ESI discovery protocols. As noted, however, Safelite confirms that it is not seeking to reopen an ESI search but is seeking only text messages from Caliber-issued cell phones in response to the requests at issue here. (ECF No. 261 at 2-7.) Thus, Caliber's objections pertaining to re-opening ESI discovery are without merit. More broadly, Caliber explains that it has produced over 500 text messages involving the individual Defendants, and non-parties Mark Turner and Chris Abal at a cost of over $30,000, and that this included all text messages from the Caliber-issued phone of the individual Defendants and Abal. Caliber also defends the date range limitations it employed and notes that it produced all text messages from Mark Turner's cell phone between Turner and the individual Defendants through his separation date.

To the extent Caliber's more broad objections are an effort to summarily dispose of all or portions of Safelite's Motion to Compel, the Court will address them first. First, Caliber's claim that it already has produced text messages between the individual Defendants and non-parties Turner and Abal does not resolve any issue here. Moreover, Caliber's approach forecloses, for example, Safelite's access to other relevant text messages that may provide evidence of Caliber's alleged solicitation efforts, including communications with Safelite technicians. Accordingly, Safelite's Motion to Compel will not be denied on this basis.

Similarly, the Court is not persuaded by Caliber's temporal scope limitations. According to Caliber, it limited the date range of text productions to either the individual Defendants' or Abal's last day of employment or the expiration of the preliminary injunction. Caliber contends that searching for texts beyond these dates would be a fishing expedition. The Court disagrees. Relevant communications could exist after the dates imposed by Caliber. As Safelite notes, "it is the content and recipient that determines [] relevance, not the time." (ECF No. 262 at 8.)

Accordingly, in considering the discovery requests at issue in Safelite's Motion to Compel, the Court does not adopt Caliber's temporal scope limitations. The Court now considers the discovery requests more specifically in turn.

### 1. RFPs 14-18

Caliber summarizes these RFPS as follows:

- **RFPs 14-17:** Produce ***all documents or communications*** . . . with [Nowak, Billingsley, Lockridge, and Lynch] regarding the recruitment, solicitation, acquisition, evaluation, or hiring of ***any potential Caliber employees***.

- **RFP 18:** Produce ***all documents or communications***, including . . . with Chris Abal regarding the recruitment, solicitation, acquisition, evaluation, or hiring of ***any potential Caliber employees***.

Caliber raises two specific objections to these requests. First, Caliber contends that communications with any potential Caliber employee regardless of whether that individual ever worked for Safelite are not relevant. Caliber makes the same argument with respect to potential Safelite hires who did not join Caliber.

For its part, Safelite argues that Caliber already has undertaken the burden of collecting and reviewing these individuals' text messages but recognizes the merit to Caliber's argument regarding the recruitment of non-Safelite employees. As for Abal's messages, Safelite asserts that evidence of him using information from the individual Defendants to solicit Safelite employees would be relevant to multiple claims, including its claims against the individual Defendants for breach of their non-solicitation and non-competition obligations and its claims against Caliber for tortious interference, misappropriation of trade secrets, and conspiracy.

The Court agrees that such text messages are relevant for the reasons cited by Safelite. This is so, however, only to the extent a message involves the recruitment of Safelite employees. Accordingly, Safelite's Motion to Compel as it relates to RFPs 14-18 is **GRANTED, in part,**

**and DENIED, in part,** to this extent. Caliber is **DIRECTED** to respond this RFP, as modified,

**WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

### 2. RFPs 19-20

Caliber summarizes these RFPs as follows:

- **RFP 19:** Produce ***all documents and communications*** . . . to or from Chris Abal between and/or regarding any ***current and/or former Safelite employee***.

- **RFP 20:** Produce ***all documents and communications*** . . . to or from Mark Turner between and/or regarding ***any current and/or former Safelite employee***.

Caliber challenges the relevance of these RFPs, arguing that neither Abal nor Turner were parties to restrictive covenant agreements with Safelite. Caliber also contends that, because Safelite currently employs more than 13,000 people nationwide, the request is burdensome and disproportionate.

To the contrary, Safelite asserts the requests are relevant regardless of any restrictive covenant. By way of example, Safelite explains that produced text messages could reveal efforts to conceal the individual Defendants' involvement in soliciting Safelite employees. Further, Safelite clarifies that it is seeking text messages from a few select individuals and notes that Caliber has demonstrated its ability to identify the former Safelite employees Caliber employs. (ECF No. 261 at 5.)

The Court agrees that such text messages are relevant, not overbroad, and proportional to the needs of the case. Further, to the extent Caliber claims undue burden, it has not made the required showing. Accordingly, Safelite's Motion to Compel as it relates to RFPs 19-20 is **GRANTED.** Caliber is **DIRECTED** to respond this RFP **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

### 3. RFPS 21-24

Caliber summarizes these RFPs as follows:

- **RFP 21-24:** Produce ***all documents and communications*** . . . to or from [Michael Fox, Nicole Jensen, Tabitha Salas, and Lisa Kokinda] between and/or regarding ***any current and/or former Safelite employee***.

Caliber argues that Fox and Jensen are not relevant custodians with respect to any text messages and the fact they previously were identified as ESI custodians as part of the ESI negotiation has no bearing on the issue. Caliber argues that text messages from Salas and Kokinda are even less relevant because these individuals were not identified as ESI custodians although Caliber acknowledges that Salas was identified in Lockridge's Initial Disclosures.

For its part, Safelite argues that Caliber overstates Safelite's relevance burden and the identification of Fox, Jensen, and Salas in Initial Disclosures is sufficient to satisfy Safelite's burden. Beyond this, Safelite contends that Fox and Jensen have been included in other already disclosed communications. As for Kokinda, Safelite asserts that Kokinda was working for Caliber in Las Vegas and may have evidence regarding Defendant Nowak's knowledge of Caliber's plans to compete with Safelite in that market and beyond.

Because Fox and Jensen were included in the ESI search and have been identified in previous communications, Safelite's Motion to Compel is **GRANTED** as to RFPs 20 and 21. Accordingly, Caliber is **DIRECTED** to produce the communications these individuals had either with each other or any of the individual Defendants relating to Safelite employees **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER**. On the current record, however, Safelite has not established the relevance of Salas's or Kokinda's text messages. Of course, Safelite may renew its motion as necessary should additional discovery demonstrate the

relevance of these latter sets of text messages at a future date. Accordingly, Safelite's Motion to Compel is **DENIED without prejudice** as to RFPs 23 and 24 relating to Salas and Kokinda.

### B. Damages RFPs

In moving to compel Caliber's responses to certain Damages RFPs, Safelite relies on the recent Sixth Circuit decision in *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,* 53 F.4th 368, 387 (6th Cir. 2022), recognizing that "[e]ach trade secrets case requires a flexible and imaginative approach to the problem of damages." In support of its motion, Safelite has submitted a Declaration from its damages expert, Dr. Devrim Ikizler, explaining why each specific request is relevant to its claims. Additionally, Safelite asserts that any of Caliber's confidentiality concerns can be addressed by the terms of the Agreed Protective Order and, in particular, by utilizing the "Attorneys' Eyes Only" designation. With respect to Caliber's claim of overbreadth, Safelite explains that Caliber's nationwide financial data is necessary and the production of such information is typical in trade secret cases. Moreover, Safelite points out, the information the individual Defendants allegedly took was not limited to the Texas and Arizona markets. Safelite confirms that it has set a beginning point of January 2018 and asserts that its proposed temporal scope is necessary for the damages model to reflect appropriate pre-event data and post-event data. Safelite also acknowledges its offer to withdraw RFPs 54 and 55 conditioned upon Caliber's full response to RFP 64.

Caliber broadly objects to these RFPs on numerous grounds, claiming that they are a fishing expedition into its most sensitive financial and strategic documents. Caliber takes particular aim at both Safelite's use of Dr. Ikizler's Declaration and his stated need for the information at issue for purposes of his damages forecast model. Further, Caliber contends generally that these RFPs seek information that is not relevant because Safelite has no evidence

19

of misappropriation, the requests are overly broad and burdensome, no information exists pre-2019 and it already has provided information through 2022.

Caliber's broad objections largely will be addressed through the Court's consideration of the specific RFPs. The Court, however, confirms the following at the outset. First, to the extent that Caliber cites confidentiality concerns, the Court agrees with Safelite that such concerns can be addressed, as appropriate, by way of an Attorneys' Eyes Only designation consistent with the terms of the Protective Order. Further, to the extent that certain requested information may not exist prior to 2019, Caliber may so state in response to a particular RFP but the Court will not endorse a wholesale temporal scope limitation to February 2019. Additionally, Caliber has not presented any persuasive authority limiting the Court's ability to consider Dr. Ikizler's Declaration in connection with Safelite's Motion to Compel. Finally, as Safelite notes, this case is not bifurcated. Thus, there is no merit to Caliber's sweeping position that these RFPs are not relevant because Safelite has no evidence of misappropriation. The Court now considers each of the Damages RFPs in turn.

1. **RFP 53:** All documents and things in your possession, custody, or control from January 1, [2018] to the present relating to your communications with or about Safelite as a competitor.

Caliber argues this information has no relevance to Dr. Ikizler's damages analysis. According to Caliber, its view of Safelite as a competitor has no bearing on the value of a trade secret or the profits Caliber allegedly made from the alleged misappropriation of any Safelite trade secret. Moreover, Caliber notes, it already has explained that "Safelite" was one of the agreed-upon search terms used during the ESI review and production. Caliber also contends that Safelite already is in possession of any communications "with . . . Safelite[.]" Thus, Caliber

insists, to the extent any relevant communications using the word "Safelite" existed in Caliber's ESI, that information already has been produced.

Safelite clarifies that it is seeking information relating to Caliber's views on Safelite as a competitor, not any communications *with* Safelite. As Safelite explains, if there are Caliber documents identifying certain Safelite processes that Caliber deemed valuable and reflect discussions about how best to recreate or copy such processes, this information would be relevant. Indeed, Safelite asserts, discussions of these processes or concepts corresponding to documents that Defendant Billingsley took from Safelite would be particularly so. Finally, as it relates to damages, Safelite cites Dr. Ikizler's explanation that Caliber's view of Safelite will help monetarily value any trade secret information Caliber obtained from Safelite.

The Court easily concludes that Caliber's view of Safelite is relevant to the claims and defenses in this case. Nevertheless, Caliber represents that any relevant communications containing the word "Safelite," which would appear to encompass documents responsive to this RFP, already have been produced. Safelite does not seriously suggest otherwise. Thus, accepting Caliber's representation and absent any evidence to the contrary, the Court will not direct Caliber to respond further to this RFP. *State Farm Mut.,* 2021 WL 2843832, at *3. Accordingly, Safelite's Motion to Compel is **DENIED** as to this RFP.

2. **RFP 57:** All documents concerning any **current or considered prices** for auto glass replacement, repair, and recalibration business, including price announcements, price lists, price schedules, or price changes communicated to customers, technicians or affiliated entities in the United States.

Caliber asserts that Safelite has not alleged Caliber's misappropriation of Safelite's trade secrets related to pricing. According to Caliber, Dr. Ikizler has the information necessary to assess "efficiency gains" because Caliber has provided its profit margins for all markets and Dr. Ikizler does not explain why this additional auto glass pricing information is necessary.

Moreover, Caliber argues, the "*considered* prices for auto glass" are certainly not relevant because those prices were never implemented. Further, according to Caliber, its auto glass pricing is not relevant unless Safelite claims and demonstrates that Caliber misappropriated nonpublic information regarding Safelite's prices. Finally, Caliber claims, responding to this RFP will be burdensome, requiring a company-wide search of all documents concerning auto glass pricing.

Safelite counters that it does not expect Caliber to search the emails of each of its employees to find any mention of price but expects that Caliber tracks the prices it charges and any plans to change those prices. Safelite explains that considered prices are relevant because they reflect how Caliber's approach may have changed in light of any trade secrets passed along by the individual Defendants. Finally, Safelite notes that it has to pursue damages discovery concurrently with merits discovery because the case is not bifurcated.

The Court agrees that this information is relevant because it could demonstrate changes in approach undertaken by Caliber as a result of information allegedly obtained from Safelite. Again, to the extent Caliber claims responding would be burdensome, it must demonstrate that production of the information or materials would be unduly so. *Delta T,* 337 F.R.D. 395, 398. And, again*,* Caliber has made no such showing here. Accordingly, Safelite's Motion to Compel is **GRANTED**. Caliber is **DIRECTED** to respond to this RFP **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

3. **RFP 58:** All documents and communications that You had with other competitors regarding business agreements, business partnerships, expansion plans, joint business offerings, exclusive licensing agreements.

Caliber characterizes this request as "breathtaking in its scope, but even more so for its intrusiveness into another competitor's business dealings." (ECF No. 260 at 17.) Caliber rejects

Dr. Ikizler's explanation that the information will reveal "where Caliber falls short of market knowledge" or provide insight into areas where Caliber could have "potential[ly]" used Safelite trade secret information." Caliber claims that responding would require reviewing e-mails from all 497 employees in its glass division, resulting in undue burden. Finally, Caliber contends that at most, this RFP should be limited to documents and communications prior to August 2021, the date by which Safelite alleges Caliber would be in possession of any trade secrets.

Safelite asserts that this request is designed to identify areas where Caliber could benefit from insider knowledge possessed by Safelite as a fixture in the auto glass industry. To refute Caliber's claim of undue burden, Safelite observes that it would be unusual for any such agreements to be found in the emails of all of Caliber's employees. By way of suggestion for moving forward on this, Safelite notes that Caliber first could be required to identify whether any such agreements exist. If so, the parties then could meet and confer to determine the documents necessary to convey the substance of those agreements.

The Court agrees that this information is relevant because it could demonstrate holes in Caliber's knowledge that Caliber undertook to address. Further, the Court finds reasonable Safelite's suggestion that the existence of any such documents be determined first. Accordingly, the Motion to Compel is **GRANTED** as to RFP 58 to the extent that Caliber is **DIRECTED** to determine whether any such agreements exist. If Caliber identifies any such documents counsel are **DIRECTED** to meet and confer regarding the appropriate manner in which to convey the substance of those agreements.

### 4. RFPs 59 and 62

These RFPs, addressed together by the parties, request the following information:

- **RFP 59:** All documents concerning any geographic locations You plan to enter for auto glass replacement, repair, and recalibration business plans within the next 5 years[.]

- **RFP 62:** All documents concerning or discussing Your actual or potential growth projections for auto glass replacement, repair, and recalibration business.

Caliber characterizes these RFPs as "perhaps the most offensive" and contends that Safelite, with its near monopoly power, cannot demonstrate that Caliber's plans over the ***next*** five years have any relevance to the claims in this lawsuit. According to Caliber, Dr. Ikizler's explanation ignores the text of RFP 59, which seeks information about Caliber's ***future*** growth plans. Caliber insists that its most sensitive business plans are not relevant to Safelite's damages analysis. As to RFP 62, Caliber asserts that Safelite already has all of Caliber's financial information by month and market for 2019 through 2022.

According to Safelite, these RFPs concern Caliber's plans for growth in the auto glass industry, both in terms of projections and new markets Caliber is considering. In his Declaration, Dr. Ikizler describes this information as "essential to determine how Caliber believed it could grow and planned to grow, compared to actual growth observed rates following the alleged misappropriation of trade secrets. Caliber['s] internal projections are indicators of the knowledge it possessed prior to the alleged misappropriation." (ECF No. 258-11 at ¶ 11.) According to Safelite, Dr. Ikizler cannot assess how the use of Safelite trade secrets accelerated the growth of Caliber's autoglass business without information concerning that growth.

The Court agrees that some information relating to Caliber's growth plans is relevant to allow Dr. Ikizler to assess the potential impact of the alleged misappropriation. However, these RFPs were contained in Safelite's Seventh Requests for Production issued on March 17, 2023. (ECF No. 258-11 at ¶ 3.) This means that, according to the plain language of RFP 59, Safelite is requesting Caliber's business plans into 2028. This time period is overbroad based on Safelite's position that the alleged trade secret misappropriation began around August 2021. (*See, e.g., id.*

24

at ¶ 4 "Safelite has asked me to assume the trade secret misappropriation began around August 2021....") Under this circumstance, the Court will limit the relevant time period in RFP 59 to five years starting in 2021. Accordingly, Safelite's Motion to Compel is **GRANTED** to this extent. Caliber is **DIRECTED** to respond to these RFPs **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

5. **RFP 63:** All of Your training materials for technicians, including but not limited to training sessions or training meetings that discuss or concern pricing (wages and benefits as itemized in their w-2 and or 1099 records), service quality, and scheduling.

Caliber contends that this information has not been limited to only its glass technicians and has no relevance to any of the claims asserted in this litigation. For its part, Safelite confirms that it is only concerned with materials for glass technicians. (ECF N. 261 n.8.) With respect to relevance, Safelite explains that Caliber may have used Safelite information to identify the best technicians to hire or the best practices relating to hiring, training, and compensating technicians. In short, according to Safelite, this RFP could uncover evidence of Safelite trade secret material making its way into Caliber's operations. Beyond this, Safelite contends that Caliber does not articulate any specific burden with respect to producing the materials it uses to train technicians.

The Court agrees that this information, as limited to glass technicians, is relevant because it could reveal evidence of Caliber's use of Safelite's trade secret information. Accordingly, Safelite's Motion to Compel is **GRANTED, as modified.** Caliber is **DIRECTED** to respond to RFP 63, as modified to include only Caliber's glass technicians, **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

6. **RFP 64**: All documents (reports, studies, analyses, surveys) concerning or discussing the auto glass replacement, repair, and recalibration business market or industry, including but not limited to documents discussing: (a) industry concentration; (b)

> market entry barriers; (c) current or forecasted status of supply or demand; (d)
> economies of scale; (e) market shares and trends; and/or (f) comparisons to other
> markets or industries, including collision and auto repair.

According to Caliber, this RFP is not limited to industry reports authored by Caliber. In Caliber's view, reports drafted by ***other*** entities would not shed light on what ***Caliber*** considered critical to succeed in the auto glass industry. Caliber also rejects Dr. Ikizler's connection of this information to his damages analysis and contends that his explanation effectively restricts this RFP to the pre-August 2021 time period only. Additionally, Caliber argues that responding to this RFP would be incredibly burdensome because, as drafted, it seeks a virtually unlimited scope of reports, studies, analyses, and surveys.

Safelite counters that Dr. Ikizler explained how RFP 64 seeks information concerning Caliber's view of the industry and what it needed to succeed. Safelite confirms that it only seeks documents with[in] Caliber's possession, custody, or control but if Caliber obtained reports drafted by others and considered them in planning its operations, those reports would be relevant to Dr. Ikizler's stated purpose. Finally, Safelite argues that Caliber has not explained the specific burden associated with responding to this request, but Safelite is willing to meet with Caliber to address the scope of the RFP and any concerns Caliber may have.

The Court agrees that information within Caliber's possession, custody, or control, relating to Caliber's view of what it would take to succeed in the auto glass industry is relevant to Safelite's misappropriation claims. Further, the Court finds reasonable Safelite's proposal to meet and confer on the scope of this RFP and any of Caliber's concerns. Accordingly, Safelite's Motion to Compel is **GRANTED** with respect to RFP 64 to this extent.

### 7. RFPs 61, 66, 67, and 68

These RFPs, also addressed together by the parties, request the following information:

- **RFP 61:** All financial documents and data records concerning Your existing auto glass replacement, repair, and recalibration business locations throughout the United States, including gross revenue, the size of the facility, and number of employees and contractors (FTE equivalent).

- **RFP 66:** For all business locations currently offering auto glass replacement, repair, and recalibration services, All of Your Transactional sales records, including collision and auto repair sales and auto glass replacement, repair, and recalibration sales, itemized at the SKU level, for all material and service sales records to all customers on all sales from January 1, 201[8] to the present.

- **RFP 67:** All past and current monthly, quarterly and annual profit and loss statements regarding the auto glass replacement, repair, and recalibration industry, for all geographic locations.

- **RFP 68:** All documents, analysis reports, projections, and data records regarding the actual and predicted fixed costs of adding auto glass replacement, repair, and recalibration business to an existing Caliber location.

Caliber contends that it has produced its profit and loss statements for the four relevant markets in Excel format broken down by month and another spreadsheet listing revenue, EBIDTA, and gross profits for *all thirty-one markets* where its glass business operates from February 2019 to December 2022, by month and by market. In Caliber's view, "[t]his is more than sufficient for Dr. Ikizler to determine how Caliber benefitted financially from any alleged misappropriation …" and the production of any further information would be burdensome. With respect to RFP 68 in particular, Caliber asserts that there is no such information because its glass business does not use brick and mortar establishments.

Safelite contends, based on Dr. Ikizler's Declaration, that this information is essential for determining the financial benefit Caliber may have generated from the alleged misappropriation of trade secrets. Safelite asserts that in the face of this, all Caliber has offered is the conclusory

assertion that the production of additional information would be burdensome. Further, to the extent that there are not documents responsive to RFP 68 due to the nature of Caliber's operations, Safelite asserts that Caliber should so state.

Quickly, with respect to RFP 68, Caliber has stated that no such information exists. Accordingly, consistent with the discussion above regarding such representations, the Court will not compel Caliber to further respond to RFP 68 and Safelite's Motion to Compel is **DENIED** to this extent. With respect to RFPs 61, 66, and 67, Caliber does not challenge the relevance of this information. Instead, it asserts, in conclusory fashion, that producing information beyond that which it considers to be sufficient will be unduly burdensome. As with Caliber's other claims of undue burden, Caliber has not put forth any evidence in support sufficient to allow the Court to make such a determination. Accordingly, the Motion to Compel is **GRANTED** as to RFPs 61, 66, and 67. Caliber is **DIRECTED** to respond fully to these RFPs **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

## V. Remaining Issues

Both parties have moved for sanctions in connection with their Motions to Compel. Under the circumstances as detailed above, the Court concludes an award of sanctions would be unjust and both requests are **DENIED.** The Court, however, notes the following. The decision to deny Safelite's request for an award of sanctions was a significantly closer call. Aside from various litigation tactics as detailed in Safelite's sanctions request, Caliber's consistently aggressive tone and default to accusations in both its filings and interactions with the Court have not gone without notice. The Court, however, is aware that Caliber recently obtained new local counsel, experienced practitioners in this Court. The Court trusts that this counsel will be abide by the standards of professionalism expected by members of the bar in this District. Should

unacceptable deviations from this high standard continue on Caliber's behalf, however, the Court will not hesitate to impose requested and appropriate sanctions in the future.

Finally, Safelite previously filed a Third Motion to Amend Preliminary Pretrial Order seeking to extend the primary and rebuttal expert deadlines. (ECF No. 250.)  Caliber opposed the motion.  (ECF No. 252.)  The proposed dates in Safelite's Motion now have passed. Accordingly, the Motion (ECF No. 250) is **DENIED** as moot.  The parties, however, are **DIRECTED** to meet and confer with respect to a revised case management schedule and to submit a joint proposed schedule to the Court within **FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

## VI.     Conclusion

For the reasons stated above, the Motions to Compel (ECF Nos. 257, 258) are **DENIED, in part, and GRANTED, in part**.  To the extent that either party has been **DIRECTED** to respond to a particular discovery request, it shall do so **WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER.**  The requests for sanctions are **DENIED.**   Plaintiff's Motion for Extension of Time (ECF No. 250) is **DENIED** as moot.   The parties are **DIRECTED** to meet and confer with respect to a revised case management schedule and to submit a joint proposed schedule to the Court within **FOURTEEN DAYS OF THE DATE OF THIS ORDER.**

**IT IS SO ORDERED.**

Date: November 14, 2023                          ___/s/ *Elizabeth A. Preston Deavers*___
                                                 ELIZABETH A. PRESTON DEAVERS
                                                 UNITED STATES MAGISTRATE JUDGE